UNITED STATES BANKRUPTCY COURT      **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
In re:                         :
                               :   Chapter 11
      TELIGENT, INC.         :   Case No.01-12974 (SMB)
                               :
                  Debtor.    :
------------------------------------X
SAVAGE & ASSOCIATES, P.C.,     :
Unsecured Claims Estate        :
Representative,             :
                               :
                Plaintiff,   :
                               :   Adv. Pro. No.: 03-03360
         --against--        :
                               :
COUNTY OF FAIRFAX, VIRGINIA,   :
                               :
                Defendant.   :
------------------------------------X

**POST-TRIAL DECISION**

**A P P E A R A N C E S:**

SAVAGE & ASSOCIATES, P.C.
Attorneys for Plaintiff
56 Lafayette Avenue
White Plains, New York 10603

      Denise L. Savage, Esq.
         Of Counsel


DAVID P. BOBZIEN
County Attorney
Co-Counsel to Defendant
12000 Government Center Pkwy., Suite 549
Fairfax, Virginia 22035

      Nancy F. Loftus, Esq.
      Assistant County Attorney
        Of Counsel

MICHAEL G. McAULIFFE, ESQ.
Co-Counsel to Defendant
48 South Service Road-Suite 102
Melville, New York 11747


**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The plaintiff commenced this preference action, in her capacity as estate representative under the debtor's confirmed plan to recover the sum of $311,434.51 from the defendant, the County of Fairfax, Virginia ("Fairfax"). The debtor had paid this amount to satisfy its 2000 public service corporation property taxes ("PSC Taxes") imposed under chapter 26 of the Virginia tax code. The Court conducted a trial on February 8, 2006, and concludes that the plaintiff failed to sustain her burden of proof. Accordingly, judgment will be entered dismissing the Complaint.


BACKGROUND

At all relevant times, the debtor Teligent, Inc. (together with its debtor subsidiaries, "Teligent") maintained its corporate headquarters in the County of Fairfax in the Commonwealth of Virginia. (<u>Joint Pretrial Order</u>, dated Jan. 30, 2006, at § 1.II.a (ECF Doc. # 42)("JPTO").)[1] Teligent was a

---

[1] At trial, the parties advised the Court that they had agreed to a slightly different version of the Joint Pretrial Order than the one signed by the Court. (Transcript of Trial, held Feb. 8, 2006 ("Tr."), at 11) (ECF Doc. # 47, Ex. A.) The differences appear to be immaterial,

public service corporation ("PSC") under the property tax scheme
employed by Virginia, and a description of the tax scheme follows
immediately below.


**A.    The Virginia Tax Scheme**

PSC Taxes are computed on a calendar year basis. VA. CODE
ANN. § 58.1-1 (West 2006)("'Tax year,' except when otherwise
specifically provided, begins on January 1 of each year and ends
on December 31 of each year").  On or before April 15, the
taxpayer is required to file a verified annual report with the
Virginia State Corporation Commission (the "Commission"),
reporting all the real and tangible personal property owned by
the taxpayer in Virginia as of the previous January 1, showing
the county, city or town in which the property is located.  See
VA. CODE ANN. § 58.1-2628.[2]  The Commission assesses the value of

---

(see Tr. at 14), and any references in this decision to the Joint Pretrial Order refer to the version
on file as ECF Doc. # 42.

[2]        Section 58.1-2628A provides, in pertinent part:

Each telegraph company and telephone company shall report annually, on
April 15, to the Commission all real and tangible personal property of every
description in the Commonwealth, owned, operated or used by it, except leased
automobiles, leased trucks or leased real estate, as of January 1 preceding,
showing particularly the county, city, town or magisterial district wherein such
property is located.

3

the taxpayer's reported property, VA. CODE ANN. § 58.1-2633,[3] and

forwards a certified copy of the assessment to each concerned

county.  VA. CODE ANN. § 58.1-2634.[4]  The tax is determined by

multiplying the assessed value by the tax rate.[5]  See VA. CODE ANN.

§ 58.1-2606.[6]  The effective date of the assessment relates back

to January 1.  VA. CODE ANN. § 58.1-1 ("'Tax day' or 'date of

assessment,' except as otherwise specifically provided, is

---

[3]      Section 58.1-2633A provides, in pertinent part:

The Commission shall assess the value of the reported property subject to local taxation of each telegraph, telephone, water, heat, light and power company and electric supplier . . . , and shall assess the license tax levied hereon if such company is subject to the license tax under this article.

[4]      Section 58.1-2634 states:

A certified copy of the assessment made pursuant to § 58.1-2633, when made, shall be immediately forwarded by the clerk of the Commission to the Comptroller and to the president or other proper officer of each company, and to the governing body of each county, city and town wherein any property belonging to such company is situated and to each commissioner of the revenue.

The assessment shall show the type of property and its value and location.

[5]      At all relevant times, the tax rate was 1.23% of the assessed value.  (See Tr. at 88.)

[6]      Section 58.1-2606 states, in pertinent part:

Notwithstanding the provisions of this section and §§ 58.1-2607 and 58.1-2690, all local taxes on the real estate and tangible personal property of public service corporations referred to in such sections and other persons with property assessed pursuant to this chapter shall be at the real estate rate applicable in the respective locality.

4

January 1 of each year").

The assessment gives rise to a first priority tax lien in all of the taxpayer's property located in Virginia.  VA. CODE ANN. § 58.1-2612.[7]  A taxpayer dissatisfied with the valuation or tax assessment may challenge it within three months by seeking review before the Commission.  VA. CODE ANN. § 58.1-2670.

The records of tax assessments, billing and payment are maintained, _inter alia_, by the Fairfax County Department of Tax Administration, Accounts Receivable Section, Revenue Collection Division.  (Tr. at 45-46, 53.)  The assessment information is loaded into the computerized tax system which generates a tax bill based on the tax rate.  (Tr. at 53-54, 87-88.)  Payment is due by February 15 of the following year.  (_See_ Tr. at 90.)  The Accounts Receivable Section receives and records the payments made by the taxpayer.  (_See_ Tr. at 86.)

---

[7]      Section 58.1-2612 states:

All the taxes and levies provided for in this chapter shall, until paid, be a lien upon the property within the Commonwealth of the corporation owning the same and take precedence over all other liens or encumbrances.

B.    **The Payments At Issue**

The payments at issue in this adversary proceeding concern the 2000 PSC Taxes.[8]  According to Fairfax County's computerized tax records, the value of Teligent's Fairfax property, as of January 2000, was assessed at $22,876,239.  Multiplying the assessed value by the 1.23% tax rate resulted in a tax liability of $281,377.74.  (Defendant's Exhibit ("DX") 3, at 9.)  On or about October 25, 2000, Fairfax billed Teligent for the 2000 PSC Taxes.  (JPTO, at § 1.II. e.)  The tax bill, (see DX 3, at 10), reflected the assessed value and the tax, and stated that payment was due by February 15, 2001.[9]

Teligent attempted to pay the 2000 taxes by sending a check dated February 27, 2001, in the full amount.  The check was not received by Fairfax until March 15, 2001, approximately 30 days after the due date.  (JPTO, at § 1.II.e, f.)  As a result of the late payment, Fairfax assessed penalties and interest against Teligent in the aggregate sum of $30,056.77.  (JPTO, at § 1.II.f.)  Fairfax applied the payment first to the penalties and

---

[8]     In 1998 and 1999, Teligent paid the PSC Taxes in a timely manner.  (JPTO, at § 1.II.b-d.)

[9]     The copy of the bill received in evidence included certain hand and other notations.  The additions were added by clerks on March 15, 2001, to reflect the application of Teligent's late payment, and the interest and penalties generated by the late payment.  (Tr. at 93-94.)

6

interest, and then to the principal amount of the taxes.  (Tr. at 93-94.)  Teligent subsequently paid the unpaid balance of the tax with a separate $30,056.77 check.  (See JPTO, at § 1.II.g.)

The plaintiff, who is authorized to bring this preference claim under Teligent's confirmed plan, sued Fairfax to avoid and recover the two payments, aggregating $311,434.51.[10]  Fairfax stipulated that the plaintiff had satisfied the first four elements of her claim under 11 U.S.C. § 547(b).  (Tr. at 15.)  Fairfax contends, however, that it was oversecured, and accordingly, the plaintiff failed to satisfy § 547(b)(5).

## DISCUSSION

**A.   The Elements of a Preference Claim and the Burden of Proof**

Section 547(b) sets forth the elements of a preference claim:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property -
>
> > (1) to or for the benefit of a creditor;
> >
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> >
> > (3) made while the debtor was insolvent;

---

[10]      The plaintiff also sued to avoid and recover $7,126.89 paid in satisfaction of certain Business Professional Occupational License taxes.  The plaintiff withdrew that claim at the conclusion of the trial.  (Tr. at 156-57.)

7

       (4) made –

           (A) on or within 90 days before the date of the filing of the petition; or

           (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

       (5) that enables such creditor to receive more than such creditor would receive if –

           (A) the case were a case under chapter 7 of this title;

           (B) the transfer had not been made; and

           (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The trustee must prove each element of a preference claim by a preponderance of the evidence.  11 U.S.C. § 547(g); <u>Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)</u>, 78 F.3d 30, 34 (2d Cir. 1995); 5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 547.13, at 547-130 (15th ed. rev. 2005)("COLLIER").  As noted, Fairfax concedes that the plaintiff has established the elements under § 547(b)(1) through (b)(4).  Only the last element is in issue.

    To satisfy § 547(b)(5), the plaintiff must prove that the transferee received more as a result of the preference than if the preference was never paid, and instead, the transferee received a distribution on its claim in a hypothetical chapter 7

case.[11]  Fairfax contends that it held a tax lien at the time of payment, and was oversecured.  It is well-settled that payments to an oversecured creditor are not preferential because the creditor would receive the full value of its collateral in a chapter 7 liquidation.  Ray v. City Bank & Trust Co. (In re C-L Cartage Co.), 899 F.2d 1490, 1493 (6th Cir. 1990); Savage & Assocs., P.C. v. A.I. Credit Corp. (In re Teligent, Inc.), 337 B.R. 39, 45 (Bankr. S.D.N.Y. 2005) ; see Comm. of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.), 59 F.3d 969, 972 (9th Cir. 1995), cert. denied, 516 U.S. 1140 (1996); 5 COLLIER ¶ 547.03[7], 547-46 to 547-47.

Typically, the transferee in a preference action is an unsecured creditor, and the plaintiff does not and need not offer evidence that transferee is unsecured.  One might expect that if the transferee asserts that it is oversecured, it has the burden to prove it.  The law, however is otherwise, based upon the unambiguous allocation of proof under 11 U.S.C. § 547(g).  Thus, where the defendant in a preference action asserts that it was oversecured, the plaintiff must prove a negative, to wit, that the defendant was not oversecured.  Mitsubishi Acceptance Corp.,

---

[11]    Although the underlying tax would have been entitled to a priority if it had not been paid pre-petition, Teligent was administratively insolvent, and confirmed a plan that paid administrative and priority creditors substantially less than 100%.  (JPTO, at § 1.II .k.)

v. Wolk (In re Lease-A-Fleet, Inc.), 151 B.R. 341, 348 (Bankr.
E.D. Pa. 1993); see Batlan v. TransAmerica Commercial Fin. Corp.
(In re Smith's Home Furnishing), 265 F.3d 959, 967 (9th Cir.
2001)("'It is therefore an unfortunate fact of life that a
preference plaintiff must effectively prove a negative (that the
defendant is not a totally secured creditor), even though the
secured creditor is the party with the most access to proof of
the validity of its own security interests.'")(quoting Lease-A-
Fleet, Inc., 151 B.R. at 348); Metro Commc'n Inc., v. Comm. of
Unsecured Creditors (In re Mellon Bank, N.A.), 945 F.2d 635, 644
n.2 (3d Cir. 1991)(noting that the preference plaintiff failed to
meet its burden of proving that the defendant, a secured
creditor, was not fully secured), cert. denied, 503 U.S. 937
(1992); Matter of Prescott, 805 F.2d 719, 726 (7th Cir. 1986)("In
order to meet this burden [under § 547(b)(5)], the trustee
generally must establish that the preferred party's claim is not
fully secured.").


B.    **The Plaintiff's Failure to Satisfy Her Burden**

      Fairfax consistently argued throughout this litigation that
it was oversecured.  It asserted this position in its answer,
(ECF Doc. # 8, at ¶ 19), and in the joint pre-trial order.  (See
JPTO, at § 6.[II], at 8) ("Defendant's Issues of Law").  This
placed the burden of proving that Fairfax did not have a lien, or

10

that its claim was undersecured, squarely on the plaintiff.  The
plaintiff failed to offer any probative evidence on either issue.


**1.    The Lien**

Since a lien arises from an assessment under § 58.1-2612,
quoted in footnote 7, <u>supra</u>, the plaintiff would have to prove
that no assessment occurred.  As noted, she did not offer
evidence that the Commission never assessed the 2000 PSC Taxes,
and in fact, the trial evidence was overwhelmingly to the
contrary.


Instead, the plaintiff contends that no lien could arise in
the absence of a distraint or levy, and Fairfax never levied or
distrained Teligent's property prior to the payment of the 2000
PSC Taxes.  Initially, the plaintiff failed to come forward with
evidence that no levy or distraint occurred.  In any event, the
plaintiff's argument is wrong.  As noted, all PSC taxes and
levies "shall, until paid, be a lien upon the property within the
Commonwealth."  VA. CODE ANN. § 58.1-2612.  The statute does not
mention "distraint."  In contrast, a more general tax collection
statute provided at the time that "[t]axes assessed per item or
in bulk against goods and chattels <u>distrained</u> shall constitute a
lien against the property so assessed."  VA. CODE ANN. § 58.1-

11

3942(C)(emphasis added.)[12]


In City of Martinsville v. Tultex Corp. (In re Tultex
Corp.), 250 B.R. 560 (Bankr. W.D. Va. 2000), the court ruled that
§ 58.1-3942(C)required distraint to create a lien in personal
property.  See id. at 564.  It contrasted § 58.1-3942(C) with
§ 58.1-3340.[13]  The latter gives the taxing authority a lien upon
real property at the moment of assessment and without regard to
distraint.  Id.  The plaintiff incorrectly argues that the Tultex
decision analyzed the PSC tax code, (Unsecured Claims Estate
Representative's Corrected Post-Trial Memorandum of Law, dated
Mar. 8, 2006, at 11 (ECF Doc. # 48))("Plaintiff's Memo"), and
relies on the case as support for her argument that distraint was
required to create a personal property lien.


Tultex dealt with the general collection provisions of
chapter 39 of the Virginia Tax Code.  It did not address chapter

---

[12]     In 2001, the reference to distraint was removed from the statute.

[13]     Section 58.1-3340 provides, in pertinent part:

There shall be a lien on real estate for the payment of taxes and levies
assessed thereon prior to any other lien or encumbrance.  The lien shall continue
to be such prior lien until actual payment shall have been made to the proper
officer of the taxing authority.

26, which governs PSC taxes.  Furthermore, in contrast to the

provision at issue in Tultex, the language of § 58.1-2612 tracks

the language in § 58.1-3340 relating to real property

assessments.  The relevant PSC tax statute does not mention

distraint, and as in the case of real property assessments, the

lien arises at the time of the assessment and without regard to

distraint.


    2.    The Value of Fairfax's Collateral

    Even if Fairfax had a tax lien, the plaintiff could still

satisfy her burden under 11 U.S.C. § 547(b)(5) by showing that

Fairfax was undersecured.  The only evidence of value offered by

the plaintiff came through the testimony of Alan Barbee, an

expert witness.  Barbee testified that Teligent was insolvent

when Fairfax sent (and Teligent paid) the 2000 PSC property tax

bill.  He admitted, however, that he did not separately value

Teligent's assets located in Virginia.  In fact, he had no

opinion regarding the value of Teligent's assets in Virginia at

the time it paid the PSC 2000 taxes.  (See Tr. at 143.)


    Furthermore, the balance sheets attached to his insolvency

report, (see PX 6, Ex. 2, at 2), showed that Teligent owned

property valued at more than $584,000,000 as of October 31, 2000,

the approximate date of the 2000 PCS tax bill.  His report did

13

not say where the property and equipment was located, although it
observed that Teligent owned property in several Virginia cities.
(PX 6, at ¶ 6.)

Even the Ernst & Young ("E & Y") liquidation analysis, on
which Barbee relied, did not undercut this conclusion.[14]
According to Barbee, E & Y valued Teligent's fixed assets at
between 1.6% and 3.4% of book value.  (Tr. at 139.)  The fixed
assets would still be worth between $9.3 million and $19.9
million, well in excess of the approximate $311,000 PSC tax
payments.

Moreover, Fairfax offered proof that its collateral was
worth substantially more than Teligent's tax liability.  As
noted, the Commission assessed the Fairfax County property at
$22,876,239 as of January 1, 2000.  In addition, the assessed
value of the property increased to $28,744,258, as of January 1,
2001.  (See DX 4, at 9.)  The Virginia Constitution, Art. X, § 2,
states that "[a]ll assessments of real and tangible personal
property shall be at their fair market value."  "Fair market
value" of property, as used in the Virginia Constitution, means
"the price it will bring when offered for sale by one who
desires, but is not obliged, to sell, and is bought by one who is

---

[14]    The E & Y analysis was not marked for identification or offered into evidence.

14

under no necessity of having it." Fonticello Mineral Springs Co.
v. City of Richmond, 137 S.E. 458, 460 (Va. 1927); accord Fruit
Growers Express Co. v. City of Alexandria, 221 S.E.2d 157, 160
(Va. 1976); see Lake Monticello Serv. Co. v. Board of Supervisors
of Fluvanna Cty., 377 S.E.2d 446, 448 (Va. 1989).  This
definition is essentially the same as the one commonly used by
appraisers and the courts.  E.g., Schonfeld v. Hilliard, 218 F.3d
164, 178 (2d Cir. 2000)("The fair market value is the price at
which the property would change hands between a willing buyer and
a willing seller, neither being under any compulsion to buy or to
sell and both having reasonable knowledge of relevant facts.")
(internal quotation marks omitted.)


     Under settled law, an assessment is presumed to be correct,
and the taxpayer who challenges the assessment has the burden of
rebutting the presumption.  See Shoosmith Bros., Inc. v. County
of Chesterfield, 601 S.E.2d 641, 643 (Va. 2004); Tidewater
Psychiatric Inst., Inc. v. City of Virginia Beach, 501 S.E.2d
761, 763 (Va. 1998); City of Mecklenburg v. Carter, 449 S.E.2d
810, 812 (Va. 1994).  Even when the assessment is not under
challenge, the assessed valuation constitutes evidence of value,
see Gunter v. GMAC Fin. Corp. (In re Gunter), 100 B.R. 311, 314
(Bankr. E.D. Va. 1989)(deeming recent tax assessment the best
evidence of value in proceeding to avoid judicial lien under 11

15

U.S.C. § 522(f)), and in the absence of other evidence, it will generally be deemed to establish value.  <u>In re Bozzelli</u>, 227 B.R. 770, 774 (Bankr. E.D. Pa. 1998).

It is also intuitively clear that Teligent's Fairfax property was worth substantially more than its tax debt.  The tax rate of 1.23% meant that the assessed value of Teligent's Fairfax property was over <u>80 times</u> greater than the amount of the tax liability.  The plaintiff did not offer any evidence that undercut the methodology of the assessment, but even if the Commission's assessment methods were not perfect, nothing suggests that the assessment was off by the magnitude required to render Fairfax undersecured.  Accordingly, the plaintiff failed to satisfy her burden of proof under § 547(b)(5).

**C.   The Plaintiff's Other Arguments Lack Merit**

   **1.   Evidentiary Objections**

      **a. Preclusion**

The plaintiff presses several objections to the introduction of certain evidence.  First, she contends that the Court should have precluded the testimony of Ebevinia T. Masa, an employee of the Fairfax County Department of Tax Administration, Accounts Receivable Section, Revenue Collection Division, because Fairfax did not identify her as a witness pursuant to the mandatory

16

disclosure requirements of FED. R. CIV. P. 26(a).  In addition,
Fairfax did not produce two documents, entitled "Persons and
Property Assessed for Taxation for the Tax Year 2000 in the
County of Fairfax, Virginia" (the "2000 Assessment Record") and
"Persons and Property Assessed for Taxation for the Tax Year 2001
in the County of Fairfax, Virginia" (the "2001 Assessment
Record"), and received in evidence as DX 3, p. 9 and DX 4, p. 9,
respectively, until less than a month before trial.  (<u>Plaintiff's
Memo</u> at 1-2.)

Initially, any suggestion that Fairfax should be precluded
for failure to produce documents in response to a specific
discovery request lacks merit.  The attorney for Fairfax
demonstrated that the plaintiff sent a discovery request in May
2003 to the wrong address.  It was mailed to the defendant rather
than to the defendant's attorney.[15]   The latter also represented
that she never saw it.  (Tr. at 5-6.)

Moreover, to the extent that the plaintiff's earlier
preclusion motion invoked her unsatisfied document request, (<u>see</u>

---

[15]      FED. R. CIV. P. 5 (a) governs the service of pleadings and other papers
"subsequent to the original complaint."  Rule 5 (b) provides:

> Service under Rules 5 (a) and 77 (d) on a party represented by an attorney
> is made on the attorney unless the court orders service on the party.

17

ECF Doc. # 39, at 9), it was procedurally improper, and was never
granted.  The motion was made for the first time in reply papers,
it failed to provide evidence that the plaintiff had satisfied
the "meet and confer" requirements under FED. R. CIV. P. 37(a)(2);
accord Bankr. S.D.N.Y.R. 7007-1(a), and the plaintiff did not
request a discovery conference as required by the Court's local
rules.  Bankr. S.D.N.Y.R. 7007-1(b).

This leaves for consideration the failures relating to
mandatory disclosure, the thrust of the earlier motion.  The
sanction of preclusion, in this respect, is governed by FED. R.
CIV. P. 37(c).[16]  Although the language of Rule 37(c) apparently
calls for automatic preclusion, it has not been applied in that
fashion.  Preclusion of important evidence is a harsh remedy akin
to the entry of a default judgment.  7 JAMES WM. MOORE, MOORE'S
FEDERAL PRACTICE § 37.60[2][b], at 37-120 (3d ed. 2005).
Furthermore, Rule 37 indicates that "automatic" preclusion is not

---

[16]     Rule 37(c)(1) provides, in pertinent part, as follows:

A party that without substantial justification fails to disclose information
required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as
required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use
as evidence at a trial, at a hearing, or on a motion any witness or information not
so disclosed. In addition to or in lieu of this sanction, the court, on motion and
after affording an opportunity to be heard, may impose other appropriate
sanctions.

appropriate where the failure is substantially justified or is harmless. Accord Bastys v. Rothschild, 97 Civ. 5154(CMGAY), 2000 WL 1810107, at *27 (S.D.N.Y. Nov. 21, 2000); Hinton v. Patnaude, 162 F.R.D. 435, 439 (N.D.N.Y. 1995); 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV.2D § 2289.1 (Supp. 2005)("The sweep of this exclusion is softened by the proviso that it should not apply if the offending party's failure to disclose was 'substantially justified,' and that even if the failure was not substantially justified the exclusion should not apply if the failure was 'harmless.') Finally, whether to sanction, and the appropriateness of any sanction, are matters ultimately committed to the discretion of the court. See National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643 (1976); Outley v. City of New York, 837 F.2d 587, 590 (2d Cir. 1988).

Whatever the reason for the failure to disclose Ms. Masa's identity or turn over the 2000 Assessment Record at the outset of the case, the failure was harmless. Fairfax moved for summary judgment in April 2005, some ten months before the trial. The motion papers attached and relied on an affidavit by Ms. Masa, and also attached the 2000 Assessment Record as Exhibit J.[17] (See ECF Doc. # 31.) The plaintiff thereafter moved for summary

---

[17]     The motion, which was based on Eleventh Amendment sovereign immunity, was denied.

judgment on or about October 21, 2005.  Fairfax opposed the
motion, and again submitted an affidavit signed by Ms. Masa.
(See ECF Doc. # 38.)  Moreover, I ordered discovery reopened on
December 1, 2005, in response to the plaintiff's preclusion
motion, to give her the chance to take the deposition of a
Fairfax representative, presumably Masa.  (See Tr. at 3.)
Fairfax's counsel thereafter asked the plaintiff if she wanted to
depose a witness, but the plaintiff never responded to the offer.
(Tr. at 5.)

In short, the plaintiff knew the substance of Ms. Masa's
testimony and had a copy of the 2000 Assessment Record at least
ten months before trial.  The suggestion that the 2000 Assessment
Record was produced within one month of trial is inaccurate and
irresponsible.  In addition, the plaintiff had the chance to
depose Ms. Masa two months before the trial, but ignored the
opportunity.  Accordingly, I decline to preclude Ms. Masa's
testimony or the 2000 Assessment Record.

Although the 2001 Assessment Record was apparently not
produced until shortly before trial, the plaintiff never argued
at trial that it should be excluded for that reason.  Initially,
the plaintiff's pre-trial preclusion motion (as well as the
objection raised in the JPTO, at § 15), was general in nature,

20

and not directed at any specific document.  As noted, the thrust
of this general objection was that Fairfax had not provided any
mandatory disclosure or produced documents, and consequently,
should be precluded from offering any evidence, regardless of
what that evidence might be.  Since a court must weigh a variety
of factors including prejudice before ordering preclusion, a
general "gotcha" preclusion motion is not particularly helpful.[18]

    At trial, the plaintiff objected to the receipt of the 2000
Assessment Record for the reason that it included certain
handwritten notations, (Tr. at 85), and because the assessed
value was derived from the annual report that was deemed
inadmissible (Ms. Masa could not authenticate it).  (Tr. at 88-
89.)  As discussed below, the latter objection confused FED. R.
EVID. 803(6) with FED. R. EVID. 1006.  The objections were
overruled, and the 2000 Assessment Record was received in
evidence as a business record.  (Tr. at 89.)

    When Fairfax offered the 2001 Assessment Record, the
plaintiff responded, "[c]ontinuing objection based upon my
earlier objection to the same exhibit for the year 2000."  (Tr.
at 96.)  The objection was overruled, and the 2001 Assessment

---

[18]    For example, the disclosing party might have only recently discovered the
document, or the document might be one located in the other party's files, or, as here, the
disclosing party might have produced the document as an exhibit to a motion.

Record was received.[19]   (See id.)   The plaintiff failed to object
to the 2001 Assessment Record on the basis that it was not
produced until shortly before trial.   Moreover, the 2001
Assessment Record is consistent with the Barbee insolvency report
that showed a increase in the book value of Teligent's equipment
from December 31, 1999 ($402,989,000) to February 28, 2001
($564,593,000).   (See PX 6, Ex. 2, at 1.)

Accordingly, the Court will not preclude any evidence
pursuant to FED. R. CIV. P. 37.

### b.   Rule 1006

The plaintiff also argues that the 2000 Assessment Record,
the 2000 tax bill, (DX 3, at p. 9), and the 2001 Assessment
Record were inadmissible under FED. R. EVID. 1006.   (Plaintiff's
Memo at 2.)   Rule 1006 deals with summaries of voluminous
writings.   It states:

> The contents of voluminous writings, recordings,
> or photographs which cannot conveniently be examined in
> court may be presented in the form of a chart, summary,
> or calculation. The originals, or duplicates, shall be
> made available for examination or copying, or both, by
> other parties at reasonable time and place. The court

---

[19]   The 2001 Assessment Record was part of a larger exhibit, (DX 4), that included
the 2001 annual report filed by Teligent.  The plaintiff objected to the receipt of the 2001 annual
report because it had not been previously produced, (Tr. at 3-4), but did not specifically object to
the 2001 Assessment Record, except as noted.  The 2001 annual report was not received in
evidence.

may order that they be produced in court.

According to the plaintiff, Fairfax never produced the relevant

documents underlying the assessments reflected in these three

documents.[20]


The objection confuses Rule 1006 with the business records

exception to the hearsay rule contained in FED. R. EVID. 803(6).[21]

Many business records are compilations or summaries of other

documents.  For example, financial statements summarize the

general ledger, and the general ledger summarizes discrete

transactions evidence by still other records, such as invoices,

---

[20]     In fact, the 2000 PSC Tax assessment was attached as Exhibit 7 to Fairfax's April 2005 motion for summary judgment.  Though offered at trial, it was not received because Ms. Masa could not authenticate it.

[21]     Fed. R. Evid. 803 states in relevant part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(6) Records of regularly conducted activity.--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness. . . .

23

checks, and wire transfers.  Where the "summary" is itself a
business record, it is admissible without regard to the
requirements of Rule 1006.  United States v. Draiman, 784 F.2d
248, 256 n.6 (7th Cir. 1986); see United States v. Catabran, 836
F.2d 453, 456-57 (9th Cir. 1988).


    Ms. Masa, a custodian of the Fairfax tax records, provided
the testimonial foundation for the receipt of these documents.
She testified that the 2000 Assessment Record was kept and
maintained by Fairfax County in the ordinary course of its
business.  (Tr. at 84-85.)  The value information was provided by
the Commission, which transmits a book containing assessment
information, and the information was loaded into Fairfax's tax
record system.  (Tr. at 87-88.)  The plaintiff did not dispute,
either at trial or in her post-trial brief, that the 2000
Assessment Record qualified as a business record under Rule
803(6).  Instead, she objected to it because the underlying
assessment report was not admitted.  (Tr. at 88.)


    The scenario was repeated for the 2001 Assessment Record.
Ms. Masa gave essentially the same testimony, (see Tr. at 95),
the plaintiff objected because the underlying assessment was not
received in evidence, and the Court concluded that the 2001

24

Assessment Record was admissible as a business record.  (Tr. at
97.)  The plaintiff acknowledged as much, and even stated that
"I'm not fighting about this document being in evidence." (Tr.
at 98.)  She nevertheless argued again that the document should
not be admitted for its truth because the underlying assessment
was not received in evidence.  (Tr. at 98.)


    The 2001 Assessment Record, like the 2000 Assessment Record,
reflected the assessed value of Teligent's personal property for
the years in question.  Both were business records, and hence,
were admissible despite the hearsay exception and without regard
to the admissibility of the underlying assessment or compliance
with FED. R. EVID. 1006.


    The 2000 PSC tax bill was also admissible.  Although Ms.
Masa testified that the bill was sent by another section of the
Department of Taxation, she also testified that the handwritten
notations, which were the subject of some argument, were made by
people acting under her supervision.  (Tr. at 89-93.)  In other
words, the bill that Ms. Masa's people marked up was obviously
generated by her Department's computerized record system.
Furthermore, Teligent plainly received the bill because it paid
it without protest.  The payment also implied the correctness of

25

the assessment.  Finally, the 2000 tax bill contained the same

valuation and assessment information found in the 2000 Assessment

Record.[22]


**2.   Section 547(c)(1)**

The plaintiff goes to some length in contending that Fairfax

failed at trial to prove its defense under 11 U.S.C. §

547(c)(1).[23]  (See Plaintiff's Memo at 6-19, 27-32.)  Fairfax

never raised the defense in its answer, (see ECF Doc. # 8), or in

the JPTO.  Furthermore, Fairfax did not raise the issue at trial,

and page 159 of the trial transcript, to which the plaintiff

refers, (see Plaintiff's Memo at 6), does not mention the

defense.  The § 547(c)(1) defense is a "straw man," designed to

shift the burden of proof to Fairfax.  In any event, the defense

---

[22]      The plaintiff had attached the 2000 bill as Exhibit C to her own earlier motion for
summary judgment.  (See Unsecured Claims Estate Representative's Motion for Summary
Judgment, dated Oct. 21, 2005, at ¶ 4) (ECF Doc. # 37.)

[23]      Section 547(c)(1) provides:

(c) The trustee may not avoid under this section a transfer -

(1) to the extent that such transfer was -

(A) intended by the debtor and the creditor to or for whose benefit
such transfer was made to be a contemporaneous exchange for new value given to
the debtor; and

(B) in fact a substantially contemporaneous exchange.

is immaterial, because the Court need not consider an affirmative defense until the plaintiff proves her direct case.  <u>Smith's Home Furnishings</u>, 265 F.3d at 965 n.4.


###    3.    Section 545

The plaintiff argues, citing 11 U.S.C. § 545,[24] that Fairfax did not acquire a lien because Teligent was insolvent at the time that it purportedly arose.  The reliance on § 545 is misplaced. Section 545 invalidates "springing liens," <u>viz.</u>, "liens that arise solely because of the financial embarrassment of the debtor."  5 COLLIER ¶ 545.02, at 545-7.  Section 545 does not invalidate every statutory lien against an insolvent debtor; if

---

[24]    Section 545 states, in pertinent part:

The trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien -

 (1) first becomes effective against the debtor -

(A) when a case under this title concerning the debtor is commenced;

(B) when an insolvency proceeding other than under this title concerning the debtor is commenced;

(C) when a custodian is appointed or authorized to take or takes possession; (D) when the debtor becomes insolvent;

(E) when the debtor's financial condition fails to meet a specified standard; or

(F) at the time of an execution against property of the debtor levied at the instance of an entity other than the holder of such statutory lien.

27

it did, there would never be a valid statutory lien in a

bankruptcy case.  Here, the lien against Teligent's property

arose by virtue of the assessment, and is not avoidable under §

545.  See id. ("Liens that become effective for other reasons are

not avoidable by the trustee.")


     The Court has considered the plaintiff's remaining

arguments, and concludes that they lack merit.  The foregoing

constitutes the Court's findings of fact and conclusions of law.

The Clerk is directed to prepare and enter a final judgment

dismissing the Complaint.


Dated:    New York, New York
          April 13, 2006


                              /s/ Stuart M. Bernstein

                              STUART B. BERNSTEIN
                         Chief United States Bankruptcy Judge


                                 28